# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

GREGG MARCHAND     :
 *Plaintiff*       :
           :   No. 3:17-cv-116
 v.          :
           :
AMY HARTMAN AND MATTHEW :
SOLAK        :
 *Defendants*      :
           :

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

When you are arrested during a traffic stop for what – according to the arresting officer's query of computerized records of the Department of Motor Vehicles ("DMV") – is a suspended driver's license, and you try to show the officer a letter on DMV letterhead stating that your license was recently reinstated, can the officer refuse to look at the letter and arrest you on the basis of the computerized DMV records alone? The answer, under clear Second Circuit precedent, is no. The letter is "plainly exculpatory" evidence and ignoring such evidence when it is immediately available exposes the officer to liability for false arrest and false imprisonment. This rule requires me to deny summary judgment as to the false arrest and false imprisonment claims brought by the Plaintiff, Gregg Marchand ("Marchand"), because, under his version of events, Defendant Officer Amy Hartman ("Hartman") refused to look at a DMV letter reinstating his license after she pulled him over and proceeded to arrest him for driving with a suspended license based solely on her computer inquiry to the DMV.

In addition, there is a genuine dispute of material fact regarding the lawfulness of the initial motor vehicle stop that prevents summary judgment as to Marchand's unlawful seizure claim. But Marchand's remaining claims – for excessive detention and for supervisory liability

against Defendant Officer Matthew Solak ("Solak," together with Hartman, "the Defendants") – fail as a matter of law based on the undisputed evidence in the record.

As more fully explained below, I DENY summary judgment to Hartman on the unlawful seizure, false arrest, and false imprisonment claims, GRANT summary judgment to Hartman on the excessive detention claim, and GRANT summary judgment to Solak.

## FACTS

The following facts, which are taken from the parties' Local Rule 56(a) statements, supporting exhibits, and briefs, are undisputed unless otherwise indicated.

On February 1, 2014, Marchand and an acquaintance drove to the Willimantic Police Department ("WPD") in Marchand's parents' car to retrieve certain documents that Marchand had requested via a Freedom of Information Act ("FOIA") request. ECF No. 52-1 at ¶ 31. At the time, he was a plaintiff in a civil rights lawsuit against a Willimantic police officer, the City of Willimantic, and the Town of Windham. *Id*. at ¶ 22. After picking up the documents he had requested from the WPD, Marchand began driving home. *Id*. at ¶¶ 31, 33. Shortly after he left the police department, Hartman pulled him over. ECF No. 51-1 at ¶ 4; ECF No. 52-1 at ¶ 4. The parties disagree about the events surrounding the stop.

According to Hartman, she was on routine patrol when she saw Marchand's car and conducted a query on its license plate on the mobile data terminal ("MDT") in her cruiser, which allowed her to access computerized DMV records. ECF No. 51-1 at ¶¶ 1-2. The query indicated that the car's registration had expired two and a half months earlier.[1] *Id.* at ¶ 3. According to

---

[1] Marchand states that the car was registered, but the DMV had mistakenly listed it as unregistered when it received the registration check and paperwork for two family vehicles at the same time. ECF No. 52-1 at ¶ 44; *see also* ECF No. 52-4 at 12 (Exhibit 3) (Marchand stating that charges were dropped after he showed the prosecutor paperwork indicating that the car was actually registered).

Defendants, there is no record of this query; Solak testified that the system retains records of queries through the MDTs in police cruisers only for up to one year. ECF No. 55 at 43-45. Upon seeing the results of her query, Hartman initiated the motor vehicle stop. ECF No. 51-1 at ¶ 4. After telling Marchand he had been pulled over because of an expired registration, and asking for his driver's license, she conducted a DMV query on his license through dispatch. *Id*. at ¶¶ 4-5. The data on her terminal indicated that DMV records showed that Marchand's license was suspended as of September 26, 2013, over three months earlier. *Id*. at ¶ 5.

According to Marchand, the stop was improper because Hartman initiated it without first running his license plate. ECF No. 52-1 at ¶¶ 2, 38. He notes that just before he was pulled over, he was at the WPD to pick up documents he had requested via a FOIA request and that WPD officers saw him there. *Id*. at ¶¶ 31-33. He further notes that the records of DMV computer queries that the Defendants produced in discovery show an initial query on "858Bad," which is not the license plate on the vehicle Marchand was driving, instead of "852Bad," which is the correct plate.[2] *Id*. at ¶¶ 2-3, 38. He asserts that these records show that it was only after he was pulled over based on the inquiry with the incorrect plate that Hartman ran a computer inquiry on Marchand's driver's license and then, finally, an inquiry on the vehicle using the correct plate. *Id*. at ¶¶ 3, 38-39, 41, 43. He also suggests that, based on the proximity of his trip to WPD to pick up the documents and the pendency of his civil rights lawsuit against another WPD officer, Hartman pulled him over for improper reasons. ECF No. 52 at 9. Defendants state that the records of DMV queries produced do not reflect Hartman's initial query, of which, Solak

---

[2] These records are redacted, ECF No. 51-3 at 2-5, and the Court does not have access to an unredacted version of the records. However, the Defendants agree that the first record they produced shows a query on "858Bad." *See* ECF No. 55 at 2-4.

testified, there is no record, but show only the queries made through dispatch after she pulled Marchand over. ECF No. 55 at 2-4.

The parties also disagree about what happened during the motor vehicle stop. Hartman states that she asked for Marchand's driver's license, registration, and insurance. ECF No. 51-1 at ¶ 4. She explains that when Marchand asked why he had been pulled over, she told him that it was because of the expired registration; when he asked why she ran his plate, she told him that random checks were routine. *Id*. The parties agree that at some point during the stop, Hartman conducted a query on Marchand's license and that the electronic DMV information at that time showed that his license had been suspended as of September 26, 2013. *Id*. at ¶ 5; ECF No. 52-1 at ¶ 5. Marchand states that after Hartman saw the query results indicating that his license was suspended, he told her that his license had been reinstated and that he had a restoration letter from the DMV and he offered to show it to her. ECF No. 52-1 at ¶¶ 5, 41-42. The letter explained that Marchand's license was restored after an administrative hearing held at the DMV on January 30, 2014—two days before Hartman pulled him over. ECF No. 51-1 at ¶ 11; ECF No. 52-1 at ¶¶ 6, 11, 25; ECF No. 51-7 at 1-2 (Exhibit G). The letter is dated January 31, 2014, bears the seal of the State of Connecticut, and is on DMV letterhead. ECF No. 51-7 at 1-2 (Exhibit G). It also bears a case number and states that it is a decision following a hearing. *Id*. I have reproduced an image of the letter here:



# State of Connecticut
## Department of Motor Vehicles
ADMINISTRATIVE PER SE UNIT - TELEPHONE (860) 263-5204
P. O. BOX 290861, WETHERSFIELD, CONNECTICUT 06129-0861
*On The Web at HTTP://ct.gov/dmv*

Case No. 13005426
DECISION

GREGG A MARCHAND
36 Echo Drive
Willimantic CT 06226

01/31/2014

Re: Hearing, Thursday, January 30, 2014, WETHERSFIELD DMV, 170B

Refusing to take a Chemical Alcohol Test Under Connecticut General Statutes Section 14-227b

Dear GREGG A MARCHAND :

As a result of a hearing held as above indicated, the following Findings of Fact and Conclusions of Law are hereby made:

FINDINGS OF FACT AND CONCLUSIONS OF LAW:

1. The operator was placed under arrest.
2. The operator refused to submit to such test or analysis.
3. Said person was operating the motor vehicle.
4. The police officer did not have probable cause to arrest the above-named operator for a violation specified in Section (b) of C.G.S. 14-227b.

Subordinate Findings, if any:

The record reveals conflicting evidence regarding the circumstances of the Respondent's arrest. The record also shows that the Respondent made a timely request for preservation of video evidence to support his defense. The video that was preserved was without audio, and not conclusive on issue of probable cause. No field tests were performed and Respondent repeatedly denied drinking.

BASED UPON THE ABOVE, IT IS ORDERED:

The operator's Connecticut license or non-resident operating privilege is hereby: RESTORED
If your license is not already suspended or subject to suspension for another reason, you will receive a Restoration Notice within 7-10 days.

DECISION RENDERED THIS 30 day of January, 2014

Commissioner of Motor Vehicles
By: Quinn , James
Hearing Officer

Marchand states that Hartman refused to look at the letter. ECF No. 52-1 at ¶¶ 41-42.

During his deposition, he explained the interaction as follows:

> A. So she said basically: You just gave me a Motor Vehicle Department paper saying your car is registered and it's not registered. And now you're going to give me a paper – another letter from the Motor Vehicle Department saying that your license is reinstated? She goes no, I don't want to see that.

ECF No. 52-4 at 4.

> A. But I know I offered her the letter, and she said she wasn't – she didn't want to look at it because I already handed her motor vehicle paperwork that wasn't true, so what's – she didn't want – she – she didn't want to waste her time basically to look at that one because why – why would that be true and this would not.
> Q. So after – after she rejected the paperwork you offered to show her what happened next?
> A. Then another officer came and I got arrested.

ECF No. 52-4 at 5.

> A. Well, the only thing I didn't like was that she didn't want to look at the other piece of paper that was this --
> Q. Uh-huh. Bear with me a minute.
> A. – based on her assumption that the registration was not valid. So, therefore, she's not going to take any other documentation from Motor Vehicle.

ECF No. 51-4 at 9. Hartman does not dispute the existence of the restoration letter, but she states that Marchand did not show her, or attempt to show her, the letter during the motor vehicle stop. ECF No. 49 at ¶ 2; ECF No. 51-1 at ¶ 11.

Hartman asserts that information concerning the restoration of the suspended license was not available on the DMV database when she consulted it during the stop, and Marchand does not dispute this. ECF No. 51-1 at ¶ 11; ECF No. 52-1 at ¶ 11. Defendants assert that "[a]ny discrepancies they have ever encountered [in the DMV database] were caused by operator error on the DMV side, consisting of the failure to enter correct information or the failure to remove incorrect or outdated information." ECF No. 51-1 at ¶ 12. And during his deposition, Officer Solak agreed with Marchand's counsel that "there was a period of time where the Department of

Motor Vehicles was changing over their electronic systems." ECF No. 52-3 at 10. Marchand also asserts that the WPD "previously encountered discrepancies due to DMV errors." ECF No. 52-1 at ¶ 12.

After determining that Marchand's license was suspended based on the computer query, Hartman placed Marchand in custody, had his car towed, and took him to police headquarters where he was charged with operating a motor vehicle with a suspended license. ECF No. 51-1 at ¶ 6; ECF No. 52-1 at ¶ 6. Marchand states that he was placed in a jail cell and held for seven hours. ECF No. 52-1 at ¶¶ 6, 66, 67. Defendants state that there is no record disclosing the duration of Marchand's detention. ECF No. 51-1 at ¶ 13. Marchand notes that the time of release is supposed to be documented on the criminal appearance bond and that it was not documented in this case. ECF No. 52-1 at ¶¶ 13, 50; ECF No. 52-6 at 2 (Exhibit 5); ECF No. 52-3 at 16 (Exhibit 2). Solak states that a person arrested on a misdemeanor motor vehicle violation is detained for as long as it takes for the arresting officer to process the detainee, book him, prepare the incident report, and present him with a criminal appearance bond and summons, and that such activities can extend the length of detention up to several hours. ECF No. 51-1 at ¶ 14. Marchand asserts that typically someone arrested for operating with a suspended license would not be jailed at all and would be processed and released in 20-40 minutes. ECF No. 52-1 at ¶¶ 14, 63, 65.

On February 1, 2014, the date of Marchand's arrest and detention, Solak was in charge at the WPD. ECF No. 51-1 at ¶ 9; ECF No. 52-1 at ¶ 9. In addition to Solak, there were three officers working from 3pm to 11pm and two additional officers who began working at 7pm. ECF No. 51-1 at ¶ 16. Between 3pm and 11pm, in addition to Marchand's arrest and processing, the officers responded to twenty-five calls for service, including eleven motor vehicle stops, one

traffic accident, one missing person, and three other custodial arrests. *Id.* at ¶ 17. Hartman responded to a call for service involving a heroin overdose less than two hours after she arrested Marchand. *Id.* at ¶ 18. This call took approximately one hour. *Id.* However, she prepared her incident report for Marchand's arrest before responding to that call. ECF No. 52-1 at ¶ 49. The Defendants state that this shift was a moderately busy evening. ECF No. 51-1 at ¶ 19. Marchand does not dispute this characterization, but denies that it was too busy to process and release him, and asserts that it was not necessary to confine him. ECF No. 52-1 at ¶ 19.

Marchand's family went to the police department with a copy of the restoration letter. ECF No. 52-1 at ¶ 8. In his deposition testimony, Marchand explained that even though his mother brought the letter to the police station, she did not show the letter to Solak at that time:

> A. . . . Solak was at the desk and he wanted to see it and she wouldn't let him see it – see the letter.
> Q. He wouldn't – she would not let see Sergeant Solak –
> A. No. Obviously, she probably felt a little – but she didn't trust him obviously. I don't know why she didn't show it to him but she didn't show it to him.
> . . .
> Q. So your brother and mother come down. They've got the paperwork but they don't show it to Sergeant Solak?
> A. Right. He wanted to see it.
> Q. Okay. You didn't see the encounter with Sergeant Solak?
> A. Huh-uh.
> Q. They just reported this to you afterward?
> A. Right.

ECF No. 51-4 at 6-7. Marchand states that his mother showed the letter to another (unnamed) officer at the station who told his family that they would not release him for several hours and that they should come back later to pick him up. ECF No. 52-1 at ¶ 8. Marchand's mother left and returned later that night to pick him up. *Id.* at ¶ 60.

Marchand requested video footage showing his visit to the WPD to pick up the documents prior to his arrest, his arrival at WPD after his arrest, his time in the jail cellblock, his

release from custody, and his family's two visits to the police station, but the video footage was not preserved and no longer exists. ECF No. 52-1 at ¶¶ 55-61. The Deputy Chief of the Willimantic Police Department submitted an affidavit stating that the department retains audio transmissions for two years from the date of recording, and retains audio/visual recordings from the booking area and cell block for approximately three months. ECF No. 55 at 67 ¶¶ 4-6. Marchand was arrested and detained on February 1, 2014, but did not file this lawsuit until January 26, 2017, and did not request any of the recordings until 2018. *Id*. at ¶¶ 4-5, 8.

## LEGAL STANDARD

The court must grant a motion for summary judgment if the moving party shows "that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson*, 781 F.3d at 44. In reviewing the record, the court "must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013).

**DISCUSSION**

Marchand brought suit under 42 U.S.C. § 1983 and specifically alleged false arrest and false imprisonment. ECF No. 1 at 2-4; ECF No. 26 at 4-5, 7.[3] Because he was self-represented when he filed the complaint and amended complaint, I must construe his allegations liberally "to raise the strongest arguments that they suggest." *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015) (internal quotation marks and citation omitted).[4] I therefore construe his allegations to also raise claims of excessive detention, ECF No. 1 at 2 (noting that he "spent seven hours in jail"); ECF No. 26 at 4 (same), and unlawful seizure, ECF No. 1 at 2 (alleging that the car he was driving was registered and that he should not have been stopped on the basis of an expired registration); ECF No. 26 at 4 (same); ECF No. 1 at 4 (alleging that the officers "were being discriminatory towards [him]"); ECF No. 26 at 7 (same). The Defendants addressed both these claims in their summary judgment briefing and Rule 56(a) statement. *See* ECF No. 51 at 27-30 (discussing the excessive detention claim); ECF No. 55 at 6-7 (same); ECF No. 51-1 at ¶¶ 13-19 (setting forth facts about the length of detention); ECF No. 55 at 1-4 (discussing the lawfulness of the motor vehicle stop); ECF No. 51-1 at ¶¶ 1-4 (setting forth facts about the motor vehicle stop). As to Solak, Marchand alleges supervisory liability. ECF No. 1 at 3; ECF No. 26 at 5. Finally, in his complaint and amended complaint, Marchand indicates that he is seeking monetary relief against Hartman and Solak in both their official and individual capacities. ECF No. 1 at 4.

---

[3] Marchand's amended complaint, ECF No. 26, is no different from his original complaint, ECF No. 1, except that it includes a citation to 42 U.S.C. § 1983 and the order of the last two pages is reversed.

[4] Marchand was self-represented when he filed the complaint and amended complaint, but this Court appointed counsel for him before the Defendants filed their motion for summary judgment. ECF No. 42 (order appointing counsel on September 4, 2018).

First, I dismiss Marchand's official capacity claims as he has not made any allegations to support them. Second, with respect to his claim that the motor vehicle stop was unlawful, I conclude that a reasonable jury could find that Hartman did not have reasonable suspicion or probable cause to initiate the stop and that Hartman is not entitled to qualified immunity. Accordingly, I deny summary judgment as to this claim. Third, with respect to Marchand's claims of false arrest and false imprisonment, I conclude that a reasonable jury could find that Hartman did not have probable cause for the arrest and that Hartman is not entitled to qualified immunity. Accordingly, I deny summary judgment on these claims. Fourth, with respect to Marchand's excessive detention claim, I find that there is no evidence to support a finding of prolonged detention and do not reach the qualified immunity issue. Accordingly, I grant summary judgment on the excessive detention claim. Finally, I grant summary judgment to Solak on the supervisory liability claim, as there is no evidence to support his personal involvement in any constitutional violations.

## I.       Official Capacity Claims

Marchand seeks damages against Hartman and Solak in both their official and individual capacities. ECF No. 1 at 4. A suit against an official in his or her official capacity "is *not* a suit against the official personally, for the real party in interest is the entity," *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (emphasis in original), here, the municipality that employs Hartman and Solak. "A § 1983 claim against a municipality or against an official sued in his official capacity . . . cannot be sustained unless the plaintiff shows that the violation of h[is] federal rights was the result of a municipal custom or policy." *Lore v. City of Syracuse*, 670 F.3d 127, 168 (2d Cir. 2012). Marchand has not made any such allegations here. His official capacity claims against Hartman and Solak are therefore DISMISSED.

## II. Individual Capacity Claims Against Officer Hartman

### A. Stop of Marchand's Vehicle

The "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. U.S.*, 517 U.S. 806, 809–10 (1996). "Therefore, traffic stops must satisfy the Fourth Amendment's reasonableness limitation, which requires that an officer making a traffic stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *U.S. v. Gomez*, 877 F.3d 76, 86 (2d Cir. 2017) (internal quotation marks and citation omitted); *see also Whren*, 517 U.S. at 810 ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

Marchand argues that the traffic stop was invalid because it was "done using an invalid license plate" and/or it was "pretextual." ECF No. 52 at 9. He notes that the records produced by Defendants show an initial query on "858Bad," which is not the license plate on the vehicle he was driving, instead of "852Bad," which is the correct plate. ECF No. 52-1 at ¶¶ 2-3, 38. He asserts that these records show that it was only after he was pulled over based on the inquiry with the incorrect plate that Hartman ran a computer inquiry on Marchand's driver's license and then, finally, an inquiry on the vehicle using the correct plate. *Id.* at ¶¶ 3, 38-39, 41, 43; ECF No. 52 at 9. Indeed, Hartman's incident report, which she completed shortly after the arrest, notes that she was on patrol "at approximately 1547 hrs," ECF No. 51-2 at 2, which is the same time that the records suggest that the incorrect license plate was queried, ECF No. 51-3 at 2. Marchand also notes that just before he was pulled over, he was at the WPD to pick up documents he had

requested via a FOIA request and that WPD officers saw him there. ECF No. 52-1 at ¶¶ 31-33.

He suggests that, based on the proximity of his trip to WPD to pick up the documents and the

pendency of his civil rights lawsuit, Hartman pulled him over for improper reasons. ECF No. 52

at 9.

Hartman argues that the stop was valid and that she was on routine patrol when she saw

Marchand's car and conducted a query on its license plate through the MDT in her cruiser. ECF

No. 51-1 at ¶¶ 1-2. She states that she initiated the motor vehicle stop because the query results

showed that the car's registration had expired. *Id.* at ¶¶ 3-4. Her incident report also states that

she conducted a query on the correct license plate before initiating the stop. ECF No. 51-2 at 2-3.

Then, during the stop, she states that she conducted additional queries on the license plate and on

Marchand's driver's license through dispatch. *Id.* at ¶ 5. She asserts that there are no records of

the initial query on the license plate – the one made before the stop – because the system retains

records of queries made through the MDTs in police cruisers for no longer than one year. ECF

No. 55 at 3; ECF No. 55 at 44 (Exhibit C). She contends that the records produced by

Defendants show only the queries made through dispatch after she stopped Marchand. ECF No.

51-3 at 1-5.

The reasonableness of an officer's actions is assessed "based on the objective

circumstances surrounding her actions and not on her subjective intent." *U.S. v. Dhinsa*, 171 F.3d

721, 725 (2d Cir. 1998). I therefore put aside Marchand's argument about Hartman's subjective

motivations and assess only whether the objective circumstances surrounding her actions

constitute reasonable suspicion or probable cause.[5] I find that the parties' dispute about the

---

[5] The Defendants argue that Marchand is raising a retaliation claim and that he may not do so for
the first time in summary judgment briefing. ECF No. 55 at 1-2. To the extent that Marchand
seeks to raise such a claim in his response brief, the Defendants are correct that "parties cannot

initiation of the traffic stop presents a genuine issue of material fact that precludes summary judgment on the issue of reasonable suspicion or probable cause. This dispute is genuine as a reasonable jury could reject Hartman's account of the stop[6] and, in particular, her statement that the records of computer queries Defendants produced show only the queries made after the stop. If it did so, it could interpret the initial entry in those records, which shows a time of 15:47 and states "no registration information found," ECF No. 51-3 at 2, as an indication that Hartman ran the incorrect license plate before initiating the stop. The dispute is also material: if Hartman ran a query on the incorrect license plate before initiating the stop, she would not have had reasonable suspicion or probable cause, as she has not articulated any other basis for believing that Hartman committed a traffic violation or was otherwise engaged in criminal activity. *Holeman v. City of New London*, 425 F.3d 184, 189 (2d Cir. 2005) ("The Fourth Amendment requires that an officer making such a stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity."); *U.S. v. Miller*, 382 F. Supp. 2d 350, 366 (N.D.N.Y. 2005) ("Reasonableness is established if a police officer, based on objective facts, has probable cause or a reasonable suspicion to believe that a vehicle or its occupant is subject to seizure for a violation of the traffic laws.").

---

amend their pleadings through issues raised solely in their briefs." *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005), *aff'd*, 157 Fed. Appx. 398 (2d Cir. 2005); *see also Clack v. Torre*, 2014 U.S. Dist. LEXIS 34578 ("Plaintiff cannot amend his pleadings to include additional claims and parties simply by mentioning these claims in his briefing.").

[6] Although Hartman's motive is not relevant to the Court's determination of whether she had reasonable suspicion or probable cause for the stop, evidence of her motivation may be relevant to a jury's determination of her credibility during trial. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (internal quotation marks and citation omitted) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions.").

In sum, a reasonable jury could find that Hartman did not have reasonable suspicion or probable cause for the stop, and summary judgment on the unlawful seizure claim is DENIED.[7]

## B. Marchand's Arrest

In analyzing claims of false arrest and false imprisonment, federal courts look to the law of the state in which the arrest or imprisonment occurred. *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004) ("In analyzing § 1983 claims for unconstitutional false arrest, we have generally looked to the law of the state in which the arrest occurred."); *Russo v. City of Bridgeport*, 479 F.3d 196, 204 (2d Cir. 2007) ("[W]e look to Connecticut state law principles to determine the validity of [the Plaintiff's] federal civil rights claim based on false imprisonment."). In Connecticut, "the applicable law for the[] two causes of action is identical." *Outlaw v. City of Meriden*, 43 Conn. App. 387, 392 (Conn. App. 1996).

"False imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." *Green v. Donroe*, 186 Conn. 265, 267 (Conn. 1982). In Connecticut, "[i]t is well-established that probable cause is a complete defense to [both] claims." *Johnson v. Ford*, 496 F. Supp. 2d 209, 213 (D. Conn. 2007); *see also Jenkins v. City of New York*, 478 F.3d

---

[7] In addition, Hartman is not entitled to qualified immunity on this claim. Qualified immunity shields an official from liability for civil damages where "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Russo*, 479 F.3d at 211 (internal quotation marks and citations omitted). Clearly established law at the time of the stop prohibited a traffic stop absent reasonable suspicion or probable cause. *Whren*, 517 U.S. at 809–10 ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]."); *Gomez*, 877 F.3d at 86 (explaining that an officer making a traffic stop must "have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity"). Further, when all facts are construed in Marchand's favor, Hartman's conduct was not objectively reasonable. Under Marchand's version of events, Hartman had no valid reason to initiate the traffic stop as she did not run a query on the correct license plate before doing so.

76, 84 (2d Cir. 2007) ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest.") (internal quotation marks and citations omitted). "Connecticut law places the burden of proving an unlawful arrest [and imprisonment] on the plaintiff." *Russo*, 479 F.3d at 203. As such, "the overall burden of proving the absence of probable cause" for the arrest also falls on the plaintiff. *Davis*, 364 F.3d at 433.

"An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed . . . a crime." *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (internal quotation marks omitted). "When determining whether probable cause exists courts must consider those facts *available to the officer* at the time of the arrest and immediately before it." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (emphasis in original) (internal quotation marks omitted). In addition, "[c]ourts should look to the totality of the circumstances and must be aware that probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* (internal quotation marks omitted).

Marchand argues that Hartman lacked probable cause for the arrest because (1) the illegality of the initial traffic stop "taint[ed] the subsequent proceedings," and (2) Hartman ignored exculpatory evidence that was immediately available to her during the stop. ECF No. 52 at 9-11. I address each of these arguments in turn

i. *"Taint" From Initial Traffic Stop*

As discussed above, I construed Marchand's complaint to raise an unlawful seizure claim. To the extent that Marchand is also arguing that the unlawful seizure "taint[ed] the

subsequent proceedings," ECF No. 52 at 9, and therefore negated probable cause for the arrest, his argument fails. This is, in effect, a civil version of the "fruit of the poisonous tree" argument. However, this doctrine does not apply to Section 1983 claims and the illegality of the initial stop has no bearing on whether the subsequent arrest violated Marchand's constitutional rights. *See Baksh v. City of New York*, 2018 WL 1701940, at *4 (E.D.N.Y. 2018) (internal citations omitted) ("Plaintiff alleges that the Officer Defendants lacked reasonable suspicion for this initial stop in order to show that his subsequent arrest was not supported by probable cause. In effect, Plaintiff argues that his arrest was 'fruit of the poisonous tree,' tainted by the allegedly unlawful stop. As the Second Circuit has made clear, however, the 'fruit of the poisonous tree' doctrine does not apply to § 1983 claims. Whether Plaintiff's initial stop violated the Fourth Amendment therefore has no bearing on whether his subsequent arrest violated his constitutional rights."); *Matthews v. City of New York*, 889 F. Supp. 2d 418, 433–34 (E.D.N.Y. 2012) (internal quotation marks and citations omitted) ("Although the Individual Defendants plausibly lacked reasonable suspicion for the stop and probable cause for the search that led to the discovery of the firearm, it does not follow that the Individual Defendants lacked probable cause to arrest the plaintiffs. Plaintiffs' theory of liability amounts to a civil version of the 'fruit of the poisonous tree' doctrine for excluding evidence in criminal proceedings. As noted above, however, the Second Circuit has held that the fruit of the poisonous tree doctrine may not be invoked to support a § 1983 civil action, because the doctrine is an evidentiary rule that operates in the context of criminal procedure . . . and as such has generally been held to apply only in criminal trials.").

### ii. Exculpatory Evidence

Marchand next argues that Hartman lacked probable cause for the arrest because she willfully ignored clearly exculpatory evidence. ECF No. 52 at 9-11. Marchand asserts that he

tried to show Hartman the letter restoring his license during the motor vehicle stop, but she

refused to look at it. ECF No. 52-1 at ¶¶ 41-42. In his deposition, he provided more details about

the interaction:

> A. . . . As I said in the report, when this happened I also asked her: Well, do you want to
> see my right to drive -- my priv -- my reinstatement of my license letter from the Motor
> Vehicle Department? And she said, and I quote: No. You already gave me a Motor
> Vehicle Department -- Well, I can't -- this isn't exactly what was said. I -- I can't imagine
> it's exactly, but it's --
> Q. You're reconstructing sort of what was said? Okay.
> A. So she said basically: You just gave me a Motor Vehicle Department paper saying
> your car is registered and it's not registered. And now you're going to give me a paper –
> another letter from the Motor Vehicle Department saying that your license is reinstated?
> She goes no, I don't want to see that.

ECF No. 52-4 at 4.

> A. But I know I offered her the letter, and she said she wasn't – she didn't want to look at
> it because I already handed her motor vehicle paperwork that wasn't true, so what's – she
> didn't want – she – she didn't want to waste her time basically to look at that one because
> why – why would that be true and this would not.
> Q. So after – after she rejected the paperwork you offered to show her what happened
> next?
> A. Then another officer came and I got arrested.

ECF No. 52-4 at 5.

> A. Well, the only thing I didn't like was that she didn't want to look at the other piece of
> paper that was this --
> Q. Uh-huh. Bear with me a minute.
> A. – based on her assumption that the registration was not valid. So, therefore, she's not
> going to take any other documentation from Motor Vehicle.

ECF No. 51-4 at 9. In their Answer, the Defendants denied that Marchand attempted to show

Hartman the restoration letter, ECF No. 49 at ¶ 2, but they argue here that even if the dispute

were resolved in favor of Marchand, it would not defeat a finding of probable cause, ECF No. 51

at 10. According to the Defendants, Hartman "was entitled to rely on the DMV database

information accessed on her MDT concerning the suspension of Marchand's license, and . . .

such information furnished probable cause, even if such information turned out to be inaccurate, and even if Marchand attempted to present her with evidence to the contrary." *Id*.

Construing the evidence in the light most favorable to Marchand, however, requires finding that Hartman refused to consider plainly exculpatory evidence that was immediately available to her. The letter Marchand attempted to present to her during the stop, an image of which appears above, was on DMV letterhead and bore the state seal, a case number, a date several months after the date of the license suspension, a specific hearing date and case number, the name of the hearing officer, the location of the hearing, findings of fact and conclusions of law, and a clearly stated order that Marchand's license was "RESTORED" as of a date before Hartman pulled him over. ECF No. 51-7 (Exhibit G). Moreover, the letter was immediately available for review as Marchand had it with him and attempted to hand it to Hartman during the stop.

Hartman argues that "it was not [her] job to authenticate the DMV letter on the spot." ECF No. 51 at 15. But she does not explain why the authenticity of a letter on the letterhead of a government agency about a matter within the agency's jurisdiction would be any more suspect than the same agency's computerized records, which were apparently known to contain occasional discrepancies. *See* ECF No. 51-1 at ¶ 12 (Defendants asserting that "[a]ny discrepancies they have ever encountered [in the DMV database] were caused by operator error on the DMV side, consisting of the failure to enter correct information or the failure to remove incorrect or outdated information"); ECF No. 52-1 at ¶ 12 (Marchand agreeing that the WPD "previously encountered discrepancies due to DMV errors"). Further, quibbles about the authenticity of the letter (for example, the absence of a signature) are irrelevant given that Hartman refused even to look at it. If taken seriously, this objection would excuse the police

from considering exculpatory evidence during an arrest altogether, on the ground that they could not be expected to authenticate such evidence "on the spot."

That is not the law in the Second Circuit, which has held that "an officer may not disregard plainly exculpatory evidence." *Panetta*, 460 F.3d at 395. In *Waldron*, he Second Circuit explained that:

> The scope of an arresting officer's obligation to consider exculpatory evidence is guided by two competing principles. On the one hand, once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest. Yet, on the other hand, an officer may not disregard plainly exculpatory evidence.

*Waldron v. Milana*, 541 Fed. Appx. 5, 8 (2d Cir. 2013) (internal quotation marks, citations, and alterations omitted). Similarly, in *Jocks*, the Second Circuit explained that although there is no "duty on the arresting officer to investigate exculpatory defenses offered by the person being arrested," an officer may not "deliberately disregard facts known to him which establish justification." *Jocks v. Tavernier*, 316 F.3d 128, 135–36 (2d Cir. 2003). "Justification" in *Jocks* referred to an exculpatory defense. *Id*. at 135. Further, in *Kerman v. City of New York*, the court denied qualified immunity to an officer on the ground that he refused to consider exculpatory evidence during an arrest. 261 F.3d 229 (2d Cir. 2001). There, officers arrived at Kerman's residence after a 911 caller stated that "a mentally ill man at this location was off his medication and acting crazy and possibly had a gun." *Kerman*, 261 F.3d at 232. When the officers arrived at Kerman's home, they spent more than an hour searching the apartment and observing Kerman's behavior. *Id*. at 240. When the paramedics arrived at the scene, they called Kerman's psychiatrist and Kerman also spoke briefly with him. *Id*. at 233. When Kerman made a statement to his psychiatrist that an officer did not like, the officer grabbed the phone and hung up without asking the doctor about Kerman's mental health. *Id*. Kerman was then hospitalized. *Id*. at 233-34.

Reversing the district court's grant of summary judgment to the lead officer, the Second Circuit explained that "the officers had the opportunity to consult a medical professional familiar with the patient's condition" and it "[could not] see the reasonableness of hanging up on a doctor in such a situation." *Id*. at 241. It further found that "the officers deliberately ignored [the opportunity] to confirm the seriousness of Kerman's condition," *id.*, and explained that "[a]n officer contemplating an arrest is not free to disregard plainly exculpatory evidence." *Id.* (quoting *Kuehl v. Burtis,* 173 F.3d 646, 650 (8th Cir.1999)).

Accordingly, easily available exculpatory evidence may void probable cause for an arrest. *See Martel v. Town of S. Windsor*, 562 F. Supp. 2d 353, 358 (D. Conn. 2008), ("In seeking an arrest warrant, a police officer may not purposely withhold or ignore exculpatory evidence that, if taken into account, would void probable cause . . . A failure to make further inquiry when a reasonable person would have done so may evidence a lack of probable cause.") (internal quotation marks and citations omitted) *aff'd*, 345 Fed. Appx. 663 (2d Cir. 2009); *Sanders v. City of New York*, 2015 WL 1469514, at *8 (E.D.N.Y. Jan. 7, 2015) (explaining that the defendants' argument that there was probable cause regardless of exculpatory video footage "contradicts controlling law in this circuit regarding an officer's duty to consider exculpatory evidence"), *report and recommendation adopted*, 2015 WL 1469506 (E.D.N.Y. Mar. 30, 2015).

Despite the clear directive that an officer may not disregard plainly exculpatory evidence, Hartman argues that she had probable cause to arrest Marchand—even if she refused to examine the reinstatement letter he offered to show her. In making this argument, she relies heavily on *United States v. Owens* and *Bryant v. Ward*. ECF No. 51 at 10-14. In *Owens*, the defendant was arrested for driving with a suspended license because officers mistakenly relied on DMV computer records showing that his public service license, as opposed to his regular license, was

suspended. *United States v. Owens*, 142 F. Supp. 2d 255, 261, 263-64 (D. Conn. 2001). The court found that probable cause existed because the mistaken reading of DMV computer records was reasonable and in good faith. *Id*. at 264. There is no indication that the defendant in *Owens* offered to provide the officer with any exculpatory evidence. The decision thus does not address whether there would be probable cause where an officer relied on computer records while refusing to consider immediately available evidence indicating that those records were inaccurate or out of date.

In *Bryant v. Ward*, the court found that there was probable cause to arrest the plaintiff for driving with a suspended license when the license was reported suspended online and the officer had no reason to believe that the information was inaccurate. *Bryant v. Ward*, 2011 US Dist. LEXIS 77345 (D. Conn. July 18, 2011). Only *after* the arrest, when the plaintiff was being processed at the police station, did the plaintiff explain that his license had been suspended for nonpayment of a fine, but that he had paid the fine and had the receipt at home. *Id*. at *3. To check this story, the officer would have had to drive to the plaintiff's home. *Id*. In other words, he would have had to conduct significant further investigation to verify the plaintiff's claim that a mistake had been made. Like *Owens*, then, *Bryant* does not address whether there would have been probable cause if exculpatory evidence was immediately available and required no further investigation. Unlike the individuals in these cases, Marchand provided Hartman with exculpatory evidence at the time of the stop and Hartman was not required to engage in any further investigation of the evidence; she merely had to look at the letter offered to her.

The other cases cited by Defendants, *see* ECF No. 51 at 15-16; ECF No. 55 at 5, do not support their position either. In *Pearson v. Lorancaitas*, the officers were not obligated to request potentially exculpatory videotapes before applying for an arrest warrant because an officer "is

not required to explore and eliminate every theoretically plausible claim of innocence." 2012 U.S. Dist. LEXIS 6226, *31-32 (D. Conn. Jan. 19, 2012). But this explanation says nothing about an officer's duty regarding plainly exculpatory evidence that is immediately available. In *Frey v. Maloney*, the court explained that the plaintiff's "chief complaint"—that the officer's investigation "was not thorough enough and had it been more searching, [the officer] would have uncovered sufficient exculpatory information regarding [the plaintiff] and therefore would never have sought an arrest warrant"—failed because the officer was not obligated to investigate further before seeking an arrest warrant. 476 F. Supp 2d 141, 154 (D. Conn. 2007). In *Krause v. Bennett*, the court explained that it "would be unreasonable and impractical to require that every innocent explanation for activity that suggests criminal behavior be proved wrong, or even contradicted, before an arrest warrant could be issued with impunity," but did not address a situation in which plainly exculpatory evidence is immediately available. 887 F.2d 362, 372 (2d Cir. 1989). Again, the principle that an officer is not required to engage in extensive investigation does not excuse her from her duty to consider exculpatory information that is immediately available.

In sum, controlling circuit precedent does not permit an officer to disregard plainly exculpatory evidence. In light of this precedent, and Marchand's testimony that Hartman refused even to look at the restoration letter from the DMV, a reasonable jury could find that Hartman did not have probable cause to arrest Marchand.[8]

---

[8] According to Marchand's deposition testimony, Hartman did not want to look at the letter reinstating his license because she had already looked at a letter stating that the car was registered when, she believed, it was not really registered. *See* ECF No. 51-4 at 9 (Marchand testified that "the only thing I didn't like was that she didn't want to look at the other piece of paper . . . based on her assumption that the registration was not valid"). The Defendants do not suggest that Hartman's obligation to review the letter reinstating Marchand's license was lessened simply because she previously determined that the registration letter Marchand showed

### C. Qualified Immunity on the False Arrest and False Imprisonment Claims

Hartman argues that even if there was no probable cause, she is entitled to summary judgment based on the defense of qualified immunity. ECF No. 51 at 16-26. Qualified immunity shields an official from liability for civil damages where "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Russo*, 479 F.3d at 211 (internal quotation marks and citations omitted).

The analysis of whether clearly established law existed must "consider whether a reasonable officer could have believed that the *specific action* taken by the defendant was foreclosed by clearly established law." *Caldarola v. Calabrese*, 298 F.3d 156, 161 (2d Cir. 2002) (emphasis added). At the same time, "officials can be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "Although earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding," and the "same is true of cases with materially similar facts." *Id.* (internal quotation marks omitted). The "salient question" is whether the state of the law gave the actors "fair warning" that their conduct was unconstitutional. *Id.*

---

her was incorrect. Nevertheless, the Court notes that such an argument would not succeed for two reasons. First, Hartman did not seek to arrest Marchand for the expired registration. ECF No. 52-6 at 1 (showing a misdemeanor summons for the suspended license only). Therefore, the only evidence presented at the stop that bore on the offense for which Marchand was arrested was the second letter, and previous events did not diminish the officer's obligation to consider evidence related to that offense. Second, there is no evidence that looking at the letter reinstating his license would have extended the length of the stop or required significant further investigation since it was only one page and was immediately available.

"There is no doubt that the right to be free from arrest without probable cause [is] clearly established." *Jenkins*, 478 F.3d at 87; *see also Huaman on behalf of J.M. v. Tinsley*, 2017 WL 4365155, at *15 (D. Conn. 2017) ("The Fourth Amendment right not to be arrested without probable cause is clearly established."). Moreover, Second Circuit precedent gave Hartman "fair warning" that an officer may not ignore plainly exculpatory evidence. *See Panetta*, 460 F.3d at 395 ("[A]n officer may not disregard plainly exculpatory evidence."); *Kerman*, 261 F.3d at 241 ("An officer contemplating an arrest is not free to disregard plainly exculpatory evidence.") (quoting *Kuehl*, 173 F.3d at 650); *Jocks*, 316 F.3d at 135–36 (explaining that an officer may not "deliberately disregard facts known to him which establish justification"); *see also Sanders*, 2015 WL 1469514, at *8 (explaining that the defendants' argument that there was probable cause regardless of exculpatory video footage "contradicts controlling law in this circuit regarding an officer's duty to consider exculpatory evidence"), *report and recommendation adopted*, 2015 WL 1469506 (E.D.N.Y. Mar. 30, 2015). Accordingly, Marchand's false arrest and false imprisonment claims turn on whether Hartman's probable cause determination was objectively reasonable.

"An officer's determination is objectively reasonable if there was arguable probable cause at the time of arrest—that is, if officers of reasonable competence could disagree on whether the probable cause test was met." *Jenkins*, 478 F.3d at 87 (internal quotation marks omitted). "If there is no dispute as to the material historical facts, the matter of whether the officer's conduct was objectively reasonable is an issue of law to be determined by the court." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007); *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (internal quotation marks and alterations omitted) ("Summary judgment for defendants on grounds of qualified immunity is therefore appropriate only if . . . the evidence is

such that, even when it is viewed in the light most favorable to the plaintiff and with all permissible inferences drawn in his favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right."). Drawing all inferences in favor of Marchand, I find that the letter was plainly exculpatory and immediately available to Hartman, and that officers of reasonable competence could not disagree that Hartman lacked probable cause when she refused even to consider it. A finding that Hartman's conduct was objectively reasonable would excuse the police from considering any exculpatory evidence during an arrest even if it required no additional investigation by the officer and would plainly invalidate the basis for the arrest.

Hartman relies in large part on *Kornatowski v. Wallingford Police Department*, 1993 U.S. Dist. LEXIS 10695 (D. Conn. 1993), to argue that her conduct was objectively reasonable—even if she refused to look at the letter. ECF No. 51 at 20-23. In this case, an officer arrested Kornatowski for operating a motor vehicle under the influence, and later testified at the DMV hearing that was held to determine whether Kornatowski's license should be suspended as a result of his arrest. *Id.* at *2-3. A few days later, the officer observed Kornatowski driving and, knowing that his license had likely been suspended as a result of the hearing, decided to conduct a motor vehicle stop. *Id.* at *3. Further, before stopping him, the officer radioed the police department to verify the status of Kornatowski's license and was told that it was suspended. *Id.* at *3-4. In fact, however, Kornatowski had received a ten-day extension on the effective date of his suspension, and was permitted to drive on the date in question. *Id.* at *4. This extension had not been entered into the DMV computer due to a data entry backlog. *Id.* at *4-5. When he was stopped, Kornatowski provided the officer with the paperwork concerning his extension. *Id.* at *5. The officer again radioed the police department and asked the desk sergeant to again check

on the status of Kornatowski's license; the DMV informed the police department that the paperwork Kornatowski had given the officer should be disregarded. *Id.* The court found that the officer was entitled to qualified immunity in part because "the DMV, the governmental agency responsible for the administration of driving privileges, had instructed the police department to disregard any documents presented by Kornatowski indicating that he was not in fact suspended at that time." *Id.* at *13-15.

Unlike in *Kornatowski*, where the officer took steps to verify exculpatory evidence presented to him during the stop and was expressly told to disregard such evidence by the DMV, Hartman refused even to look at exculpatory evidence that was presented to her. In addition, the officer in *Kornatowski* considered exculpatory evidence despite having a host of information that suggested the license was suspended: he knew that Kornatowski had been previously arrested, that this subjected him to a suspension of his license, and that a hearing had been held just a few days earlier to determine whether the license would be suspended; he nonetheless took steps to check his information, and only proceeded with the arrest after the DMV itself instructed the police to ignore the paperwork offered by the driver. *Id.* at *13. By contrast, Hartman refused to look at exculpatory evidence and had far less information suggesting Marchand's license was suspended. The *Kornatowski* decision thus does not help Hartman; if anything, it highlights the deficiencies in her policing, assuming, as I must, that Marchand's version of events is accurate.

Hartman also cites *Mayer v. City of New Rochelle*, 2003 U.S. Dist. LEXIS 8761 (S.D.N.Y. 2003). ECF No. 51 at 23-24. In this case, officers responding to the scene of an accident ran a DMV check on each individual involved in the accident. *Mayer*, 2003 U.S. Dist. LEXIS 8761 at *2. The check indicated that Mayer's registration was suspended. *Id.* Mayer told the officers that he had a valid insurance card and showed it to the officers, but he did not show

them any documentation issued by the DMV. *Id.* at *3. The officers arrested him. *Id.* The court granted the officers qualified immunity on Mayer's false arrest claim, explaining that it was not unreasonable for the officers to have arrested Mayer even though he showed them his insurance card. *Id.* at *22. Unlike the officers in *Mayer*, who looked at the insurance card Mayer provided to them before deciding to continue with an arrest on the basis of DMV records, Hartman refused to look at the letter Marchand provided her. In addition, the exculpatory evidence in *Mayer* was a card issued by an insurance company whereas in this case the exculpatory evidence was issued by the DMV, the same agency whose computer records Hartman is relying on to justify the arrest. The facts of *Mayer* do not support a finding that it was objectively reasonable for Hartman to refuse to look at the letter reinstating Marchand's license.

Hartman also cites *Pointer v. District of Columbia*, where an officer pulled Pointer over for running a red light. 736 F. Supp. 2d 2 (D.D.C. 2010) at 4. During the stop, the officer conducted two checks on Pointer's license, saw that his commercial license was disqualified, and arrested him. *Id.* The next day, Pointer learned that his commercial license was disqualified only because he had not submitted his medical records. *Id.* at 5. The same morning, the officer learned that a disqualified commercial license is still valid for operation of a passenger vehicle. *Id.* The court granted the officer's motion for summary judgment and noted that qualified immunity is not negated because the officer was later shown to be mistaken about the validity of the license. *Id.* at 8. This case suggests that an officer may have arguable probable cause for an arrest if she misunderstands a notation in DMV records, but it does not support Hartman's argument that an officer has arguable probable cause for an arrest where she ignores exculpatory evidence that is immediately available to her.

Because a reasonable juror could find that Hartman did not have "arguable probable cause" for the arrest, summary judgment on the false arrest and false imprisonment claims is DENIED.

### D. Marchand's Detention

In *Russo*, the Second Circuit held that there is "a clearly-established constitutional right to be free from prolonged detention caused by law enforcement officials' mishandling or suppression of exculpatory evidence in a manner which shocks the conscience," *Russo*, 479 F.3d at 211 (internal quotation marks omitted), and that such a claim fits under the Fourth Amendment's protection against unreasonable seizures, *id.* at 209. "To prevail on this claim, [the plaintiff] must establish (1) that he has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the actions of the officers violated that right, and (3) that the officers' conduct shocks the conscience." *Id.* at 205 (internal quotation marks omitted). In addition, the plaintiff must establish that the detention was prolonged. *Id.* at 209.

Here, Marchand states that he was detained for seven hours. ECF No. 52-1 at ¶¶ 6, 66, 67. Hartman does not directly dispute this, but states that there is no department record disclosing the duration of Marchand's detention. ECF No. 51-1 at ¶ 13. In any case, even assuming that the detention was for seven hours, Marchand is unable to establish a Fourth Amendment violation. In *Russo*, the plaintiff had been detained for a period of 217 days and an officer had waited 68 days to turn over an exculpatory videotape to the prosecutor. *Russo*, 479 F.3d at 209. And in discussing the right to be free from prolonged detention, the *Russo* Court noted the Supreme Court's decision in *Baker* that "three days over a New Year's weekend" did not amount to a prolonged detention. *Id.* at 207 (quoting *Baker v. McCollan*, 443 U.S. 137, 145

(1979)). Lower court decisions in the Second Circuit provide further support for the finding that Marchand's detention was not excessive. *See Marshall v. City of New York*, 2014 WL 1468890, at *3 (S.D.N.Y. Apr. 15, 2014) ("Marshall's claim, which is based on just a few hours, is not a cognizable Fourth Amendment violation."); *Lumpkin v. Brehm*, 2018 WL 2768641, at *9 (S.D.N.Y. June 8, 2018) ("According to Plaintiffs, Lumpkin was detained for ten-and-a-half hours. On the record before it, this Court cannot find that that detention was prolonged or excessive.").

Because there is no evidence to support a finding of prolonged detention, I do not reach the other elements of Marchand's excessive detention claim or the qualified immunity issue. Summary judgment as to the excessive detention claim is GRANTED.

### III.    Individual Capacity Claim Against Corporal Solak: Supervisory Liability

Marchand alleges supervisory liability against Solak. This claim appears to relate only to his detention at the police station and not to the initial stop or arrest. ECF No. 52 at 13-15. Because I granted summary judgment on Marchand's excessive detention claim, his continued detention does not form a basis for his supervisory liability claim against Solak. *Reddick v. Lantz*, 2010 WL 1286992, at *6 (D. Conn. Mar. 29, 2010) ("Absent an underlying constitutional violation, there is no cognizable claim for supervisory liability."). But in any event, the record does not support Marchand's supervisory liability claim against Solak.

"The liability of a supervisor under § 1983 can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5)

failure to act on information indicating that unconstitutional acts were occurring." *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995)).[9] Marchand has provided no evidence to support Solak's liability under any of these theories.

Marchand has not submitted evidence of "direct participation" by Solak. In his complaint, he stated that "John Doe, the officer in charge[,] wouldn't let me out of jail. Even when my brother and mother came to Police Department to show a copy of the letter for my right to drive." ECF No. 1 at 3; ECF No. 26-1 at 3. In his deposition testimony, however, he clarified that his mother did not actually show the letter to Solak at the Police Department:

> A. And she brought a copy down. And she told me this, but I reminded her about it the other day. She don't remember it. But my bro – brother probably probably does. But she said that: Yeah, the – um, Solak was at the desk and he wanted to see it and she wouldn't let him see it – see the letter.
> Q. He wouldn't – she would not let see Sergeant Solak –
> A. No. Obviously, she probably felt a little – but she didn't trust him obviously. I don't know why she didn't show it to him but she didn't show it to him.
> . . .
> Q. So your brother and mother come down. They've got the paperwork but they don't show it to Sergeant Solak?
> A. Right. He wanted to see it.
> Q. Okay. You didn't see the encounter with Sergeant Solak?
> A. Huh-uh.
> Q. They just reported this to you afterward?
> A. Right.

ECF No. 51-4 at 6-7. Marchand also explained that he did not have any contact with Solak:

> Q. Okay. Did you ever meet Sergeant Solak during the time you were there?
> A. Have I ever met him?
> Q. Well, no. Were you – that day, the . . .
> A. No. I seen him – you know, I think I seen him behind the desk – you know, behind the window –

---

[9] In a Section 1983 action, "officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Rather, each "official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* at 677.

Q. Uh-huh.
A. – when I left.
Q. Uh-huh.
A. That's it.
Q. But you didn't speak to him or anything like that?
A. No.

*Id*. at 7. This testimony indicates that Solak was not directly involved with Marchand's detention and, far from ignoring the exculpatory evidence, actually asked to see it when Marchand's mother brought a copy of the letter to the station. Marchand has not submitted any other evidence to support a finding of supervisory liability on the basis of direct participation.

Marchand argues that Solak failed to remedy a wrong after being informed of it and was grossly negligent in his supervision of the jail. ECF No. 52 at 13-15. For a supervisor to "be found liable for his deliberate indifference to the rights of others by his failure to act on information indicating unconstitutional acts were occurring or for his gross negligence in failing to supervise his subordinates who commit such wrongful acts," "the plaintiff [must] show an affirmative causal link between the supervisor's inaction and her injury." *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002). Here, Marchand argues that Solak is liable because he "signed the incident report that omitted material exculpatory information (i.e., that the wrong plates had been run, Marchand's statements, and the DMV letter)." ECF No. 52 at 14. But he has not submitted any evidence to suggest that Solak knew about the exculpatory information and ignored it. Indeed, the evidence that has been submitted shows the opposite—that Solak "wanted to see [the letter]," but was not given the opportunity to do so. ECF No. 51-4 at 6-7. Marchand also argues that Solak is liable because he signed paperwork that omitted Marchand's time of release. ECF No. 52 at 14. But he fails to provide any evidence showing an affirmative causal link between Solak's decision to sign a report omitting the time of release and the continued detention.

Because I find that there is no evidence to support a finding of supervisory liability, I do not reach the qualified immunity issue. Summary judgment as to Marchand's supervisory liability claim against Solak is GRANTED.

## IV. Spoliation

Marchand argues that summary judgment should be denied as a spoliation sanction because the radio calls, voice communications, and video footage related to the arrest and detention were not retained by the Defendants. ECF No. 52 at 16-17.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Orbit One Communications, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 435 (S.D.N.Y.2010) (internal quotation marks omitted). If a party is found liable for the spoliation of evidence, a district court has broad discretion to impose sanctions "so long as the sanctions imposed are molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Taylor v. City of New York*, 293 F.R.D. 601, 614 (S.D.N.Y. 2013). "The Second Circuit has elaborated that sanctions serve the purpose of: (1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation." *Id.* (internal quotation marks omitted).

In this case, Marchand argues that the Court should deny summary judgment as a spoliation sanction. However, I denied summary judgment on the unlawful seizure, false arrest, and false imprisonment claims, and granted summary judgment on the excessive detention and supervisory liability claims only after construing all facts in Marchand's favor—including

allegations, like those related to the length of detention—that may have been supported by video evidence. Accordingly, Marchand has not been prejudiced by the loss of audio and video recordings at this stage of litigation.

If he so chooses, Marchand may file a motion in limine pursuant to Rule 37(e) before trial to request an adverse inference with respect to the audio and video evidence. Fed. R. Civ. P. 37(e) (permitting courts to impose sanctions "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery). Any such motion would need to demonstrate not only that an adverse inference is warranted, but also that it would not be unduly prejudicial to the Defendants.

## CONCLUSION

For the reasons set forth above, the Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.

 _/s/ MICHAEL P. SHEA_
Michael P. Shea, U.S.D.J.

Dated:       Hartford, Connecticut
            June 5, 2019